# NO.: 25-2978

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**MAURA O'NEILL,**

Appellant,

v.

**NYU LANGONE HOSPITALS, NEW YORK-PRESBYTERIAN QUEENS, LENOX HILL HOSPITAL,**

Appellees.

**APPELLANT BRIEF**

March 12, 2026

Maura O'Neill107 South West Street, #108
Alexandria, VA 22314
Phone: (571) 465-6304
Email: moneill@rahillco.com

# TABLE OF CONTENTS

***Page***

**STATEMENT OF THE CASE ........................................................................1**
**JURISDICTIONAL STATEMENT ..............................................................11**
**STATEMENT OF THE CASE ......................................................................11**
**ARGUMENT SUMMARY ...........................................................................23**
**STATEMENT OF ISSUES RAISED ON APPEAL .......................................30**
**LEGAL ARGUMENT ..................................................................................32**
POINT I: NY LAW GOVERNED AD. ........................................................32
POINT II: FAKE "AGENT" ILLEGALY TURNED O'NEILL'S MEDICAL RECORDS INTO INADMISSIBLE HEARSAY. ........................................34
POINT III: APPELLEES VIOLATED NUMEROUS LAWS .......................36
POINT IV: APPELLEES VIOLATED THE ADA.......................................37
POINT V: DEFAMATION CLAIMS SHOULD NOT BE DISMISSED. ....39
POINT VI: APPELLANT HAD CLAIMS FOR BREACHS OF FIDUCIARY DUTY...........................................................................................40
POINT VII: FRAUDULENT CONCEALMENT CLAIMS ARE VALID. ..44
POINT VIII: FRAUD CLAIMS ARE VALID. ............................................46
POINT IX: APPELLANT PROPERLY STATED IIED CLAIMS. ..............48
POINT X: APPELLANT PROPERLY STATED RICO CLAIM. ................51
POINT XI: APPELLANT MOTIONS TO AMEND WERE IMPROPERLY DENIED..................................................................................................51
**CONCLUSION ...........................................................................................52**

# TABLE OF AUTHORITIES

**Page**

Cases

*159 MP Corp. v. Redbridge Bedford, LLC*,
33 NY 3d 353, 128 NE 3d 128, 104 NYS 3d 1 - NY: Court of Appeals, 2019 ........9

*Acosta v. Byrum*,
638 S.E.2d 246, 253 (N.C. Ct. App. 2006) ........................................................38

*Brown v. Plata*,
131 S. Ct. 1910 (2011) ...........................................................................................3

*Cannell v. Medical and Surgical Clinic, S.C.* (1974),
21 Ill.App.3d 383, 315 N.E.2d 278 .....................................................................41

*Chorches for Bankr. Est. of Fabula v. Am. Med. Response*, Inc.,
865 F.3d 71, 81 (2d Cir. 2017) .............................................................................47

*Cleary v. Cleary*,
427 Mass. at 295-96 .............................................................................................28

*Cook v. Optimum/Ideal Managers Inc.*,
130 Ill. App. 3d 180, 188, 473 N.E.2d 334, 340 (1984) .....................................41

*Delaware, L. & W.R. Co. v. Roalefs*,
70 F. 21, 22 (3d Cir. 1895) ...................................................................................35

*D'Elia v. Menorah Home and Hosp. for Aged and Infirm*,
51 A.D.3d 848, 859 N.Y.S.2d 224 (2d Dept. 2008) .............................................43

*Dickerson v. Longoria*,
414 Md. 419, 438, 995 A.2d 721, 733 (2010) .....................................................34

*Eng v. NYU Hospitals Center*,
No. 156810/2014, 2019 WL 6716380 (N.Y. Sup. Ct. Dec. 10, 2019) ....................19

*Gagnon v. Coombs*,
39 Mass. App. Ct. 144, 146, 654 N.E.2d 54, 56 (1995) ....................................13

*Garone v. Roberts' Tech. & Trade Sch., Inc.*,
47 A.D.2d 306, 310, 366 N.Y.S.2d 129, 133 (1975)..........................................42

*Germain v. M & T Bank Corp.*,
111 F. Supp. 3d 506, 537 (S.D.N.Y. 2015) .........................................................40

*Hogan v. Bullock*,
224 N.Y.S.3d 226, 229 (3d Dep't 2024) ................................................................33

*In re U.S. Foodservice Inc. Pricing Litig.*,
2009 WL 5064468, at *18 (D.Conn. Dec. 15, 2009)...........................................45

*Kelley v. Apria Healthcare, LLC*,
232 F. Supp. 3d 983 (E.D. Tenn. 2017)................................................................38

*Matter of Adler*,
83 Misc. 3d 911, 217 N.Y.S.3d 417 (N.Y. Sup. Ct. 2024)...................................28

*Neal v. Asta Funding, Inc.*,
WL 3887760, 2014 U.S. Dist. LEXIS 113142, (S.D.N.Y. June 17, 2014).............39

*Parada v. Banco Indus. de Venezuela, C.A.*,
753 F.3d 62, 70 (2d Cir. 2014)..............................................................................25

*People v. Smithtown Gen. Hosp.*,
93 Misc. 2d 736, 402 N.Y.S.2d 318 (Sup. Ct. 1978)...........................................19

*People v. Varas*,
487 N.Y.S.2d 579 (1985).....................................................................................7, 8

*Perry v. Rockmore*,
228 N.Y.S.3d 753 (App. Div. 2025).....................................................................44

*Rich v. Fox News Network, LLC*,
939 F.3d 112, 117 (2d Cir. 2019)....49

*Ross v. Cmty. Gen. Hosp. of Sullivan Cnty.*,
150 A.D.2d 838, 841, 541 N.Y.S.2d 246, 249 (1989)....42

*Scollar v. City of New York*,
160 A.D.3d 140, 74 N.Y.S.3d 173, 178 (1st Dep't 2018)....49

*Shannon MACDONALD, et al., v. Otto F. SABANDO*,
2024 WL 2748417 (D.N.J.)....7, 33

*Shelton v. CIOX Health, LLC*,
No. 17 CV 808, 2018 WL 4211447, at *5 (E.D.N.Y. July 20, 2018)....40

*Sherwood v. Danbury Hosp.*,
252 Conn. 193, 746 A.2d 730 (2000)....43

*Slainte Invs. Ltd. P'ship v. Jeffrey*,
142 F. Supp. 3d 239, 262 (D. Conn. 2015)....44

*U.S. ex rel. Tiesinga v. Dianon Sys., Inc.*,
231 F.R.D. 122, 123 (D.Conn.2005)....44

*World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*,
530 F.Supp.2d 486, 507....28

***<u>Federal Stautes</u>***

28 U.S.C. § 1291....11
42 U.S.C. § 1395bb(a), JC, RC 01.01.01; RC 02.01.01.... 12, 18
42 U.S.C. § 1395cc(f)....7, 18
42 U.S.C. § 1395cc(f); PBH § 2984(1)....50
42 U.S.C.A. §§ 12101-12213....24

***<u>Federal Regulaitons</u>***

42 C.F.R. § 482.43(a)(1)-(3).... 18, 20
42 C.F.R. § 485.642(a)(1)-(3)....26

42 CFR § 482.11 ....................................................7
42 CFR § 482.13(b)(2)....................................................34
42 CFR § 482.24 ....................................................38
42 CFR §482.24(b) ....................................................35
45 CFR § 164.502(g)(5)(i) (A)(1)....................................................37
45 CFR § 164.502(g)(5)(i)(A)(1 ....................................................8
45 CFR § 164.502(g)(5)(i)(A)(1)....................................................29
45 CFR § 164.524(d)(3)....................................................50
45 CFR 164.524(a)(2)-(4)....................................................50
Medicare Program Integrity Manual Issued 12-07-12....................................................18
65 FR 82462....................................................37
65 FR 82581....................................................37

***<u>New York Stautes</u>***

8 NYCRR § 29.2(a)(3).................................................... 12, 18
10 NYCRR § 405.9(h)(1) ....................................................19
Educ. Law § 6530(2)....................................................8
PHL § 18 ....................................................38
PHL § 2803[1][g]....................................................19
PBH § 2980 et. seq....................................................7, 21
PBH § 2983(3)[2]....................................................12
PBH § 2990....................................................4, 5
PBH§ 2983(3) ....................................................12
Penal Code § 175.10 .................................................... 12, 19
Penal Law § 175.10....................................................2
Penal Law § 175.10, 215.40(2)....................................................2
Penal Law § 215.40(2)....................................................2

**<u>GA</u>**

O.C.G.A, § 16-10-24....................................................15
O.C.G.A. § 13-3-1....................................................33

***<u>Rules</u>***

FRCP 8....................................................40
Rule 9(b)....................................................45

***<u>Secondary Sources</u>***

102 Am. Jur. Proof of Facts 3d 95 .....................................................................5
141 A.L.R. Fed. 603 (Originally published in 1997) ..................................................... 25

Appellant submits this Brief to appeal an order from Judge Kovner filed on October 27, 2025 (the "Order") (A20)[1] dismissing causes of action against NYU Langone Hospitals ("NYU"), New York-Presbyterian Queens ("NYPQ"), and Lenox Hill Hospital ("LHH") (together "HAs," or "Appellees").

## STATEMENT OF THE CASE

Why would any sane person deprive a mentally ill person who had violent tendencies mental health care treatment? Obviously, no sane individual would. Yet, the sick and utterly depraved team composed of Deutsche Bank Securities, Inc. ("Deutsche Bank," "DB," or the "Bank"), Chris Wilder, a former DB employee, and HAs are claiming to have done just that to O'Neill, despite the fact there are laws explicitly banning the DB/Wilder team's and HA's illegal and unethical actions. (A[ ]). Clearly, the DB/Wilder team and HAs are lying because if O'Neill truly was mentally-ill, then HAs and the DB/Wilder team would never deprive O'Neill of access to treatment.

As described below, the DB/Wilder team illegally incentivized HAs to strip O'Neill of her rights in order to cover-up for the fact Wilder sexually harassed O'Neill when she worked at DB, then stalked her to her next employer Lehman Brothers, Inc. ("Lehman"), and informed her Lehman colleagues that Wilder intended to drug and rape O'Neill to make his sexual harassment problems go

[1]Pages in the Appendix are denoted A# in this document.

away. Wilder was fired from DB for threatening to drug and rape O'Neill, but DB commit a series of crimes to cover-up for Wilder's wrongdoing. Years after Wilder's firing, in 2017, Wilder began to drug and rape O'Neill to coverup for his prior crimes. The DB/Wilder team also hired the team Jeffrey Epstein used to coverup for his crimes to assist the DB/Wilder team in harming O'Neill, cyberstalking her, and drugging and sex trafficking her. HAs helped the DB/Wilder/Epstein team to coverup for their crimes by destroying evidence of the DB/Wilder team's wrongdoing.

Biomedical ethics professionals determined years ago that it is unethical to deprive someone who is seriously mentally ill and violent of treatment, and there are laws to stop sick and evil actors like the DB/Wilder team and HAs from doing to O'Neill what they stated in legal filings, and medical records they did as described below.[2] Yet, rather than admit they falsified their medical records to coverup their wrong doing, a crime in New York [Penal Law § 175.10], destroyed evidence of sexual assault in violation of NY's penal code [Penal Law § 215.40(2)], and facilitated a sick drug-facilitated sex trafficking operation, HAs lied and claimed their mistreatment of O'Neill and utterly sick and ridiculous medical records showed no evidence of wrong-doing even though HAs medical records and actions are clearly illegal. [Penal Law § 175.10, 215.40(2)].

[22]https://mhanational.org/position-statements/mental-health-treatment-in-correctional-facilities/

There are laws and regulations to protect mentally ill prisoners in correctional facilities and preserve inmates' human rights. In fact, correctional facilities are compelled by the US constitution to provide minimum mental health services and decrease rates of violence. Notwithstanding their loss of liberty, prisoners with mental health and substance use conditions retain all rights to adequate mental health treatment including their rights to informed consent, and access to information about all treatment options.[3] Prisoners also retain their rights to accurate medical records, clear marks showing alterations to their medical records, and substantiation for any mental health diagnosis written in their medical records. Inmates also have the right to participate in the construction of their own treatment and discharge plans. *Id.* Yet HAs and the DB/Wilder team deprived O'Neill of all human and legal rights afforded to prisoners.

In 2011, the Supreme Court decided *Brown v. Plata*, and ordered California to release over 40,000 prisoners because medical services, including mental health care, did not comply with the minimum level of care required by the Eighth Amendment. *Brown v. Plata*, 131 S. Ct. 1910 (2011). Yet, prisoners in California at issue in *Brown* were provided more mental healthcare services and rights than HAs and the DB/Wilder team provided to O'Neill for the last eight years, even though the Supreme Court stated prisoners in California with serious mental illness, who

[3]https://mhanational.org/position-statements/mental-health-treatment-in-correctional-facilities/

had better access to care and treatment than O'Neill if she really was "mentally-ill" did not receive minimal care as required by law. Thus, HAs and the DB/Wilder team, in conjunction with the NYPD and Georgia police, have knowingly and deliberately violated O'Neill's human and legal rights, stripped her of all due process, acted unethically, abused and assaulted her, and treated her with less care than prisoners in correctional facilities.

O'Neill never signed an advanced directive ("AD") that would allow any person to make healthcare decisions for her, but even if she had, any agent under the fake AD would have had fiduciary duties and an obligation to act in O'Neill's best interests. Obviously, since prisoners in correctional facilities in New York are not deprived of their rights the way O'Neill has been, it is obvious the DB/Wilder team and fake agent never intended to comply with their fiduciary duties.

In NY, an AD is called a healthcare proxy, and legislation was passed in the 1990s to govern how healthcare providers were required to implement ADs. An AD in NY is not called a "durable Power of Attorney," but the DB/Wilder team insists on calling the document the wrong name. Despite the fact NY's AD laws had been on the book for decades before the events described in the Second Amended Complaint ("SAC") (A51), HAs are lying and claiming PBH § 2990 gives them the right to implement an AD according to the laws of another state, an

absurd claim, given nothing in PBH § 2990 ever allowed HAs to IMPLEMENT any AD signed in any state according to the laws of another state.

The plain language of PBH § 2990 states "A health care proxy or similar instrument executed in another state or jurisdiction in compliance with the law of that state or jurisdiction shall be considered validly executed for purposes of this article." Thus, the plain language of the text shows PBH § 2990 clearly states what allows a healthcare provider to consider a document "validly executed," AND PBH § 2990 explicitly states an AD from another state can be considered "validly executed" for the purposes of "this article." (A234-A237). THIS ARTICLE is the laws governing how NY healthcare providers ARE REQUIRED BY LAW to IMPLEMENT an AD in ACCORDANCE with the NY's statutes, not the laws of any other state. (A234-A237).

HAs also absurdly claimed that by passing the healthcare proxy statute the NY legislature intended to supersede all other healthcare laws and allow patients to dictate to physicians how they should practice medicine and how hospitals should operate. This claim is ridiculous given NY hospitals and doctors are regulated entities, required by LAW to follow NY laws when operating and practicing medicine respectively. It also is illegal for doctors to adhere to any term or condition in any AD presented by any patient that conflicts with "community practice standards" or "applicable law." 102 Am. Jur. Proof of Facts 3d 95 (A229).

Because Wilder hails from MA, the DB/Wilder team is lying and claiming O'Neill signed a Powe of Attorney ("POA") under MA law because MA has extremely weak POA laws compared to NY's POA laws. Likewise, the DB/Wilder team is lying and claiming Appellant signed an AD under GA law because GA has very weak AD laws even though at the time in question O'Neill lived in NY, had no plans to move anywhere, the statutes were posted online, and O'Neill arranged for her aunt, a NY resident, to have a POA and AD executed under the laws of the state of NY long before the events in question. Thus, O'Neill was clearly well aware of the protective nature of NY's laws and would never have been stupid enough to sign documents under the laws of other states with weaker laws.

Obviously, HAs are jurisdiction shopping, lying, and selecting laws from other states in which they are not domiciled, have no license to operate, and in which the NY Department of Health ("NYS DOH") has no jurisdiction to govern their actions in violation of NY statutes. *N.Y. Comp. Codes R. & Regs. Tit. 10 § 405.2.* Thus, HAs are making the absurd argument NY hospitals are allowed to choose their own regulators, despite the fact, NY statutes require hospitals to be licensed to operate in NY [10 CRR-NY 600.2] and be subject to the laws of NY.

Further, HAs are lying and claiming all 50 states' healthcare laws are the same, even though even a cursory review of AD and other statutes shows laws vary

by state. It has been well established since the 1800s that states have the right to regulate the practice of medicine within their own states. *Dent v. West Virginia*, 129 U.S. 114 (1889). Thus, HAs are knowingly lying and should lose their NY licenses to operate healthcare facilities as a result.

In addition, it is a crime in NY for a physician to practice medicine without a license under the laws of another state in which he does not have a license. *Shannon MacDonald et al., v. Otto F. Sabando*, 2024 WL 2748417 (D.N.J.). (A233-234). Thus, an Appellee ER physician only licensed to practice medicine in NY is committing a crime by stating he has a right to practice medicine under the laws of another state, something any NY ER MD would know. *Id*; 42 CFR § 482.11; Article 28 of the PBH; PBH § 2980 et. seq.; 42 U.S.C. § 1395cc(f). Thus, it was absurd for HAs to claim a piece of paper in the form of an AD gives a patient, who has no medical license, the right to tell doctors to commit crimes.

It is also a crime in NY for a doctor practicing medicine in a NY hospital to fail to follow NY's public health laws which govern informed consent, the use of ADs in NY, and other matters. *People v. Varas*, 110 A.D.2d 646, 647, 487 N.Y.S.2d 577, 579 (1985). (A237). Yet, here, HAs and the DB/Wilder team are claiming NY doctors willingly commit criminal offenses and failed to follow NY's informed consent [PBH § 2803] and AD statutes [PBH § 2983(2); PBH § 2983((3);

PBH § 2983(5); PBH § 2983(6); PBH § 2984], even though failure to do so results in criminal penalties. *People v. Varas*, 487 N.Y.S.2d 579 (1985).

Without question, practicing medicine fraudulently or beyond its authorized scope constitutes professional misconduct in NY. Educ. Law § 6530(2). (A262). Here, no NY ER physician had a license to practice medicine in the state in which the fake AD was executed or to use another state's informed consent provisions. Thus, by definition, by claiming HA's NY ER doctors all had a right to practice medicine according to the laws in which the fake AD was executed, HAs are admitting to misconduct. Educ. Law § 6530(2). Here, given HAs' ER physicians knew they were not authorized to practice medicine in the state in which the AD was executed, which is by definition is "beyond the scope" of practice allowed by NY law [Educ. Law § 6530(2)], HAs are stating HAs ER physicians engaged in misconduct, and should be subject to penalties. A doctor who willfully violated law, engaged in professional misconduct, and is therefore not credible, and should not be allowed to confer fiduciary duties upon any agent. [45 CFR § 164.502(g)(5)(i)(A)(1)].

Despite these facts, based on illegal *ex-parte* communication, the Lower Court failed to recognize that courts are not allowed to honor statements in any piece of paper that conflict with public policy. *159 MP Corp. v. Redbridge*

*Bedford, LLC*, 33 NY 3d 353, 128 NE 3d 128, 104 NYS 3d 1 - NY: Court of Appeals, 2019.

The utterly absurd story the DB/Wilder team generated to account for HAs lies, criminal acts, and insistence on treating O'Neill far worse than prisoners in correctional facilities, is that O'Neill is violent. (A229). Obviously, since violent criminals in prisons are not deprived of their human and legal rights and are given access to healthcare treatment, the DB/Wilder team is paying others to lie and call O'Neill violent.[4]

Further, HAs are lying and claiming one HIPAA regulation [45 CFR § 164.524] gave them the right to deprive O'Neill of access to medical records that would allow her to receive the same type of mental health treatment afforded to criminals if she really was mentally ill. (A70). However, that same HIPAA regulation has a condition precedent, HAs ignored. 45 CFR § 164.524 (A94; A 241). Namely, to deprive a person of access to medical records, the provider must be exercising professional judgment. [45 CFR § 164.524]. Clearly, a physician that is breaking laws, committing crimes, and acting unethically is not exercising the "professional judgment." (A87-103). Further, the Department of Health and

[4]On February 12, 2026, the DB/Wilder team drugged and harmed O'Neill to create fake documentation O'Neill is "violent" and has other medical issues. However, the records created violate numerous state and federal laws and contradict prior filings from Corporation Counsel, the NYPD, HAs, and the DB/Wilder team. O'Neill with file subsequent motions about this issue.

Human Services ("HHS") officially stated that when crafting HIPAA laws and regulations, the US Congress and HHS never intended for HIPAA to supersede ANY patient care laws, including Joint Commission ("JC") standards that regulate patient care. (A242). Nor was HIPAA ever intended to supersede the EMTALA or any state patient care law. (A242). Since O'Neill was a patient of HAs in 2017 and 2018 before the passage of the Chevron doctrine, HAs and previous courts were required to follow HHS regulations.

O'Neill's claims for fraud, fraudulent concealment, and intentional infliction of emotional distress ("IIED") were improperly dismissed by the Lower Court because the dismissal of O'Neill's claims was based on a series of lies told by HAs and the DB/Wilder team on an *ex-parte* basis. Among other things the Lower Court ruled HAs had not fraudulently concealed information because the Lower Court was led to believe HAs were following state and federal laws when clearly that was not the case. Further, O'Neill's IIED claims were improperly dismissed because the court was told HAs and the DB/Wilder team's actions were legal when in fact their actions were criminal. Further, O'Neill's fraud and fraudulent concealment claims were based on information she clearly could never have known or guessed.

O'Neill's defamation and ADA claims were raised for the first time in the SAC. Given O'Neill is *pro se,* the judge violated Rule 15 because clearly it is not

futile for O'Neill to amend the SAC, given lawyers with years of experience are given numerous opportunities to amend complaints, particularly when new information becomes available.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action under [28 U.S.C. §§ 1331, 1343, and 2201]. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because the District Court entered the Order, and Appellant filed a timely notice of appeal on November 19, 2025. (A33).

## STATEMENT OF THE CASE

### A. Factual Background

#### 1. False Claims of Mental Illness

As explained in a motion filed on January 30, 2026 (Docket Nos. 37, 39) (the "Motion"), in order to have evidence of drug facilitated sexual assault destroyed, Wilder, a serial rapist who racked up more signed agreements with women he raped or abused per year in a shorter period of time than Harvey Weinstein,[5] and DB lied and fabricated ridiculous claims Appellant is mentally-ill, and violent.

---

[5]Kantor, Jodi; Twohey, Megan. "Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades." *The New York Times*. October 5, 2017.

The evil and sick psychopaths from the DB/Wilder team then bribed an ER physician, Dr. Huang, at LHH to falsely claim Appellant was "mentally-ill," "delusional," and "lacked capacity" to make healthcare decisions, despite the fact that by LHH's own admission there is no factual support in any of Appellant's medical records to support any claim Appellant is mentally ill, much less ever lacked of capacity in violation of federal and NY statutes [42 U.S.C. § 1395bb(a), JC, RC 01.01.01; RC 02.01.01; PBH§ 2983(3); 8 NYCRR § 29.2(a)(3);14 NYCRR 36.2 [a]; 10 NYCRR § 405.9(h)(1); PBH § 2980 et. seq.; Penal Code § 175.10].

When preparing for the appeal, O'Neill checked filings and records and saw they were altered. Thus, in March 2026, O'Neill contacted LHH and requested a new copy of LHH's record. The LHH record sent in 2026 was revised to make it appear that LHH's ER physician Dr. Huang had relied on statements a nurse claims in the records that O'Neill made. However, the statements in the record are not what O'Neill told the nurse, and are factually inaccurate as shown in O'Neill's recordings at LHH. Instead, in violation of federal and NY law, O'Neill's records were fraudulently rewritten without noting the changes as described below.

**2. Sick Scheme**

Following Appellant's sick, evil and criminal experience at LHH, Wilder continued to drug and sexually assault O'Neill by using a sick scheme. Given the DB/Wilder team knew which drugs Appellant was drugged with, since the evil

team the DB/Wilder team hired had done the drugging, the DB/Wilder team then executed a sick scheme to destroy evidence. Namely, under the fake guise of being Appellant's "agent" under a fake POA and AD, the DB/Wilder team would ensure evidence of druggings was either never collected or to the extent tests were run, the tests tested for the wrong drugs, so the DB/Wilder team could claim there was "no evidence" of wrongdoing. (A123; A147-148).

Thus, when Appellant went to NY hospitals, including LHH, Columbia, NYU Langone, and Beth Israel to have forensic evidence collected hospitals would either (1) refuse to collect forensic evidence (e.g., LHH) (A147), (2) refuse to take urine or blood samples for testing (e.g. NYU Langone) (A147-148), (3) refuse to run tests for drugs (e.g., Beth Israel), (4) deliberately test for the wrong drugs (e.g. Columbia) (A147-148), or (5) lie to the police to ensure the police tested for the wrong drugs (e.g., NYU Langone, Columbia, Beth Israel). (A147-148).

In violation of Appellant's rights under the NY AD statute and POA laws, the DB/Wilder team ensured evidence of drugging was destroyed without Appellant's knowledge or consent and without providing O'Neill with her right to question any decision made by the fake "agent." PBH § 2983(5); *Gagnon v. Coombs*, 39 Mass. App. Ct. 144, 146, 654 N.E.2d 54, 56 (1995).

**3. Forensic Evidence**

There are over 1,000 drugs that can be used to facilitate sexual assault. The NYC Office of the Chief Medical Examiner ("OCME") had the ability to test for any drug Appellant was drugged with, yet, rather than allow the NYPD/OCME to run comprehensive tests of Appellant's fluids (e.g., blood or urine) to definitely determine what Appellant was drugged with, the DB/Wilder team, Appellees, and the police went out of their way to implement a clearly fraudulent scheme to destroy evidence, rather than ensure proper testing. (A148).

As shown in OTC drug tests that can be bought at Walgreens or any drug store, it is common knowledge that for a drug test to detect a particular drug, a person must use a specific test for that drug. For example, if a parent wants to see if his child is using cocaine, then the parent will not buy an OTC drug test that only tests for marijuana because the drug test is to test for marijuana, not cocaine. Here, if for example the DB/Wilder team had drugged O'Neill with a benzodiazepine, they made sure Appellees and the police only tested for cocaine, and not benzodiazepines.

As the police in both NY and Georgia know since they participate in drug courts, the police were required to ensure they told the OCME and GBI to test for the right drugs.[6] Yet, in Appellant's case, at the DB/Wilder team's behest, the OCME in NY and GBI in Georgia, tested for the wrong drugs, so the tests would

---

[6]Appellant was living in NY but worked in GA part time and in NY part time.

show "no evidence" of wrongdoing on the part of Wilder and his rapist associates. Further, it is standard procedure in NY for the OCME to test for at least 500 drugs, but in Appellant's case the OCME tested for less than the standard 500 to ensure there was "no evidence" of Wilder's wrongdoing, and the GBI only tested for one drug because the police deliberately asked the GBI to test for the wrong drug to coverup for Wilder's crimes. O.C.G.A, § 16-10-24.[7]

### 4. HIPAA Violations

Without O'Neill's knowledge or consent, HAs illegally created a second set of medical records O'Neill knew nothing about until 2022, more than 5 years after discharge from HAs (A152, 153), despite the fact HAs previously told O'Neill she had all records and refused to send denial of access records as required by HIPAA (A173). Yet Appellees are illegally withholding those records from O'Neill. The utterly ridiculous lie the DB/Wilder team created to justify Appellees' violations of numerous state and federal law is Appellant is a "safety risk" even though Appellant has no criminal record or history of violence and Wilder has racked up more signed agreements per year with women he raped or abused than Harvey Weinstein.

[7]The DB/Wilder team is now claiming that it had private labs test for "all drugs." However, drug tests are shown on pieces of paper, and the team Jeffrey Epstein and Wilder hired to cover-up for their crimes have cybercrime expertise. It is common knowledge sophisticated hackers can modify documents and successfully hide their presence. https://www.globalknowledge.com/us-en/resources/resource-library/articles/the-5-phases-of-hacking-maintaining-access/#gref

### 5. EMTALA Violations

Further, if O'Neill was really a safety risk, under the EMTALA [42 U.S.C. § 1395dd], Appellees were required to call a psychiatrist, and ensure O'Neill was properly assessed in person and treated on ***PREMISES***. (A241). Yet, no such assessment and treatment ever occurred as shown in O'Neill's medical records. *Id.* Under the EMTALA, hospitals that participate in Medicare, which is essentially all NYC hospitals, were required to examine O'Neill to determine the presence of an emergency medical condition ("EMC"). *Id.*

In the revised LHH record Huang ridiculous claimed O'Neill had an "interview" with a psychiatrist, but that is a lie and there is no record in O'Neill's medical records of any interview with any psychiatrist, which there was required to be if any such "interview" really did happen. Instead, when a psychiatrist entered O'Neill's room and made a stupid false statement, O'Neill called him on the lie and he left in short order. O'Neill was then released by LHH's Dr. Kesten within short order with simple discharge instructions that made no mention of mental illness. (A78, A172).

Under the EMTALA, if a patient is judged to be dangerous to self or others, she is considered to have an EMC and is only considered stabilized when the individual no longer requires treatment that prevents injury to self or others, no matter if the risk is imminent or at some point in the future. *Id.* O'Neill's medical

records make no mention of any safety risk or violence, and Appellant was clearly never evaluated by a psychiatrist as required by HHS for any risk of safety to herself or others nor treated for "safety risk" by any Appellee. *Id.*

Further, under NY law, if Appellant really did pose a "safety risk," then NY hospitals were required to inform Appellant of her treatment options and allow Appellant to make treatment decisions [PBH § 2983(5)] which of course no healthcare provider ever did as shown in LHH's own records. (A202).

All Appellees should have incurred CMPs due to their failures to require an on-call psychiatrist to come to the ER to perform psychiatric examinations and participate in the screening and stabilizing of O'Neill, irrespective of whether the ER MD requested the services of the on-call psychiatrist because CMS determined ER physicians are incapable of screening or stabilizing psychiatric patients under EMTALA. (A75).

As of January 2026, Appellant learned for the first time Appellees are lying and claiming this was a "fog of war" situation in which one hospital made one mistake. However, this same "mistake" was made on six different occasions by NY hospitals. Obviously, this was not an "innocent mistake," and was instead part of a calculated plan to strip O'Neill of her human and legal rights.[8]

---

[8]As of February 12, 2026, O'Neill learned HAs dreamt up an even more ridiculous explanation. But, addressing that issue is outside the scope and will be addressed in follow-on memos.

### 6. Other Statutory, Regulatory and Ethical Violations

HAs also violated numerous other statutes including, but not limited to:

- Despite the fact 8 NYCRR § 29.2(a)(3) requires physicians to maintain accurate medical records, and under NY law, a patient has an absolute right not to have her medical records fraudulently altered by a physician, Appellees violated NY and other federal laws and altered O'Neill's records without showing the alterations. [42 U.S.C. § 1395bb(a), JC, RC 01.01.01; RC 02.01.01; Medicare Program Integrity Manual Issued 12-07-12; 42 U.S.C. § 1395cc(f)].
- Further, things O'Neill said and did on Appellees' premises were not included in her medical records. Instead, fraudulently vague statements like O'Neill was "delusional," "paranoid" and showed circular thinking were written in her medical records to make it appear as if she said and did things on Appellees' premises to make it appear as if she was mentally-ill even though there was no valid substantiation for any such claim contained in Appellant's medical records in violation of NY and federal laws. [42 U.S.C. § 1395bb(a); 42 C.F.R. § 482.43(a)(1)-(3)]. In the revised records O'Neill viewed in March 2026, LHH attempted to add "substantiation," but the "substantiation" is absurd since it is from a nurse who got almost all the facts completely wrong as shown through O'Neill's recordings of her conversations with that nurse. As the DB/Wilder team subsequently admitted, they rewrote what O'Neill said on HAs' premises to tell the DB/Wilder team's story and not O'Neill's, or as they falsely claimed to "correct lies." On more than eight occasions O'Neill has told the actual facts of the case to two psychiatrists, three psychologists, and three other mental health professionals. Not only did the ethical mental health professional have no problem understanding why Wilder was a psychopath and threat to O'Neill, but none believed O'Neill was mentally ill. In fact, the psychiatrist O'Neill hired to do an in-depth evaluation stated O'Neill was not mentally ill and the Wilder team was engaged in a "cover-up."
- The DB/Wilder team's rewrites to O'Neill's medical records are absurd because the LHH record does not contain accurate statements and does not comply with DSM criteria for a diagnosis of delusions or any mental health disorders, and nurses are not qualified to diagnosis mental illness. Nor are ER physicians according to HHS. (A274). Yet, there is no record from any psychiatrist in O'Neill's medical records to contain any facts to support a diagnosis of any mental health condition. Further, if any healthcare provider had any questions, they were required to ask, but as shown through their own records and Appellant's recordings, LHH's providers never did because they were working for the DB/Wilder team, who was intent to harm O'Neill.

- By definition, if someone "lacks capacity" and "insight" into her own mental health, then she would need detailed medical records that explain why precisely healthcare practitioners arrived at such conclusions. Healthcare records that contain the wrong information, provided by a third party, without attribution, are clearly harmful and destructive and violate even the most basic federal patient care standards given NY and federal laws require substantiation for any diagnosis or condition to be written in O'Neill's medical records and workable discharge plans. [PHL § 2803[1][g],10 NYCRR § 405.9(h)(1), *Eng v. NYU Hospitals Center*, No. 156810/2014, 2019 WL 6716380 (N.Y. Sup. Ct. Dec. 10, 2019)]. Yet there is no substantiation for any diagnosis or condition as required by the DSM for any mental health disorder in O'Neill's medical records.
- Starting in 2022, over four years after discharging O'Neill, Appellees subsequently admitted their medical records were altered in violation of NY and federal laws to make it appear as if claims O'Neill was mentally-ill were based on what O'Neill said and did on their premises even though HAs records contain lies, and the alteration of business records to coverup for malpractice is a crime in NY. [Penal Code § 175.10; *People v. Smithtown Gen. Hosp.*, 93 Misc. 2d 736, 402 N.Y.S.2d 318 (Sup. Ct. 1978)].
- Providers are required to write in medical records who provided information contained in medical records, and providers have an affirmative duty to maintain accurate medical records of what occurred at the time of treatment during their evaluations. 42 CFR §482.24(b) ("The hospital must ensure that all medical records accurately and completely document all ..evaluations, care plans, treatments, interventions, care provided). Yet, in O'Neill's case, none of this happened. In fact, not a single evaluation contained in her medical records from any HA is accurate and shown in Appellant's recordings. (A65; A68; A137-A138, A192). Instead, the altered records make it appear doctors determined O'Neill was mentally-ill based on what she said and did on their premises. It is sick to try to gaslight someone into believing claims she was mentally ill were based on what she said and did on HAs premises.
- What type of sick freak would try to convince a person who truly was "delusional," or "paranoid," or showed "circular thinking" that the claims she was "delusional," paranoid" or showed "circular thinking" were based on what she said and did on their premises in violation of NY and federal laws?
- How precisely does this Court believe O'Neill could get follow-up care or treatment for "delusions," or "paranoia" or "circular" thinking if she really did display those characteristics if there is no substantiation for any of those claims in her medical records to comply with DSM standards? O'Neill spoke to numerous mental health professionals. None had an answer to that question

because no one knows how to treat someone who is "delusional" or "paranoid" without substantiation because no mental healthcare professional or O'Neill knows the basis for the claims O'Neill is "delusional" or "paranoid." Further, as mental health professionals really believed there was "nothing happened," then why did the DB/Wilder team and police ensure all video camera footage was destroyed? It would have been far more effective to collect video camera surveillance footage and simply shown O'Neill the footage if "nothing happened."

- Given O'Neill was informed in 2014 the DB/Wilder hired a team to "destroy" her and the DB/Wilder team has sought since 2006 to undermine and destroy O'Neill's credibility to coverup for Wilder's sexual harassment, rape threats, stalking, and criminal wrong-doing, the DB/Wilder team never had any intention of allowing O'Neill to have treatment because the DB/Wilder team never wanted O'Neill to have treatment. Instead, before O'Neill was ever fraudulently "diagnosed" with "lack of capacity," the DB/Wilder team had already told the NYPD that O'Neill was permanently "damaged" and "disabled." Given the DB/Wilder team's story was that O'Neill was permanently "damaged" and "disabled," the DB/Wilder team and HAs made sure O'Neill never had any access to mental health treatment if she really was mentally ill. In so doing, the DB/Wilder team and HAs admitted inhuman abuse, unethical conduct, and violations of numerous statutes designed to prevent such abuse and maltreatment.
- JC standards required if any HA was relying on medical records from another provider [42 U.S.C. § 1395bb(a), JC standard RC.02.01.01 EP21; 42 C.F.R. § 482.43(a)(1)-(3); PBH § 2803] (A69, A78), that a copy of such record be part of the treatment record. (A78).
- Doctors are not allowed to simply accept what another provider determined. Instead, doctors in NY are required to report the wrongdoing of other physicians PBH § 230(11)], which clearly none did in this case.
- HAs claimed in legal filings in Georgia [NGDA, Case No. 1:22-cv-00011-SEG) (the "Georgia Action"),] O'Neill would have to wait until the "discovery" phase of litigation to view information to support claims in O'Neill's medical records even though this claim violated numerous state and federal statutes. (A70). Of course, HAs did not cite any statutes or case law to support the fraudulent claim O'Neill would have to wait until the discovery phase of litigation to view her own heath information. (A70-71). By making this claim, HAs admitted they never intended to treat O'Neill. In fact, given HAs claimed in 2022 that O'Neill would need to wait until the discovery phase to view copies of her own medical records that were written in 2017 and 2018 or at least four years prior, HDs

admitted diagnosing and treating O'Neill were not the HAs objectives, despite their statutory obligations. (A70-71).

- O'Neill's medical records from HAs clearly show that all claims of mental illness are based on lies from third parties, not anything O'Neill said or did on HAs premises, and O'Neill's medical records are medically invalid and legally inadmissible because they are based on hearsay and lies. [*Franzese v. Mackay Trucking Corp.*, 10 A.D.2d 713, 199 N.Y.S.2d 514 (2d Dep't 1960); *Delaware, L. & W.R. Co. v. Roalefs*, 70 F. 21 (C.C.A. 3d Cir. 1895); *DeLuca v. Kameros*, 130 A.D.2d 705, 705-06 (2d Dep't 1987);" *Johnson v. Lutz*, 253 N.Y. 124, 127, 128 (1930)].
- JC standard RC.02.01.01, EP 21 states, "The medical record of a patient who receives urgent or immediate care, treatment, and services contains…A copy of any information made available to the practitioner." (A71). Thus, any information provided to any HA from another provider should have been in O'Neill's records. Yet, none are.
- As of December 2025, the DB/Wilder team started to fraudulently claim O'Neill had prepared a "wish list" in the form of an AD. However, a piece of paper in the form of an AD does not override the informed consent provisions contained in NY's AD law. [Public Health Law § 2803; PBH § 2983(2); PBH § 2983((3); PBH § 2983(5); PBH § 2983(6); PBH § 2984]. Thus, No Appellee was ever allowed to honor "wish list" in an AD that conflicted with NY's AD laws. (A235) [PBH § 2980 et. seq.].
- While HAs were required by law to tell O'Neill about her treatment options, none did so. (A78-79).
- Further, O'Neill had a right to override any decision made by an agent when O'Neill was on HAs' premises. [PBH § 2983(5)]. (A98).
- As noted in NY statutes, the collection of forensic evidence for a rape exam is time sensitive, and it a well-known basic fact that drugs used to facilitate sexual assault only remain in the blood and urine for a few hours. Thus, any decision regarding the collection of forensic evidence needed to be made while O'Neill was on HAs' premises. [PBH § 2983(5)].
- NYU was not allowed to deny O'Neill's request to speak to a toxicologist and have her urine samples thoroughly tested. Yet, NYU denied O'Neill's request with no explanation. [PBH § 2983(5)] (A143).
- NYPQ was not allowed to lie to O'Neill and tell Appellant her urine had been tested on site when in fact that was not the case, and NYPQ sent the urine out to an external lab and then cancelled the test without O'Neill's knowledge or consent [PBH § 2983(5)] (A143-145).

- NY's sexual assault laws required O'Neill be provided with documentation so that she could pursue claims against Wilder in court. But, HAs, the NYPD, and Corporation Counsel violated these laws as well, and falsified their medical records, police reports, and court filings to cover up for their own wrongdoing and make it impossible for O'Neill to be successful in her court proceedings.
- While O'Neill's medical records were required by law to be written in O'Neill's best interest, the DB/Wilder team used O'Neill's medical records as trophies that they shared with the police, even though the police should have known that the records failed to comply with the DSM and even the most basic standards of care afforded to violent criminals.
- Given the unethical behavior of HAs, O'Neill recorded her conversations with HAs' providers. In the spring of 2025, after yet another story change, the DB/Wilder team broke into O'Neill's storage unit to destroy evidence and O'Neill's recordings. Further, in June 2025, the DB/Wilder team wiped several years of O'Neill's email to destroy O'Neill's recordings and evidence of the DB/Wilder team's, the NYPD's and HA's wrongdoing. Next, the DB/Wilder team lied to attorneys O'Neill consulted following those events and had the attorneys claim the allegation the DB/Wilder team destroyed evidence of its criminal acts were "far-fetched."

**7. Forensic Review**

Defendants are also relying on fake claims made in phony messaging accounts that were set-up by the DB/Wilder team without Appellant's knowledge or consent to impersonate O'Neill. The fraud O'Neill hired to perform a forensic analysis of her i-Phone lied in a court action and claimed O'Neill called and asked him destroy the very evidence O'Neill hired him to produce, but by his own admission he never gave to her. The digital forensic liar the DB/Wilder team bribed to destroy evidence of the fact Wilder set up phony accounts to impersonate O'Neill, lied with impunity to a court and violated even the most basic DOJ standards like HAs because the digital forensics fraud, like Appellees in this

action, relied on *ex-parte* communication and clear abuses of power.[9] Further, it is obviously a crime to destroy evidence.

**B. Procedural Background**

- On 06/22/2023, O'Neill filed the complaint.
- On 0/22/2024, O'Neill filed the SAC.
- On 06/09/2025, the Magistrate filed the Report.
- On 10/27/2025, the Order was filed.

## ARGUMENT SUMMARY

The rationale for dismissing the action is deeply flawed for several reasons. First, the Lower Court engaged in illegal *ex-parte* communication with liars, and never bothered to read any statutes or check the false claims made by HAs and the DB/Wilder team. Second, any middle school student knows it is easy to win an argument when only one side has a chance to present its case. Given O'Neill could never have reasonably guessed HAs were claiming to have the right to choose their own regulator, commit crimes by claiming to have the right to practice medicine according to the laws of another state, and lie about statutes, laws, and regulations on an *ex-parte* basis, O'Neill was clearly stripped of her due process rights. Third, the dismissal of most of O'Neill's claims is reliant on the lie O'Neill executed an AD and POA under the laws of different states, and HAs had a right to ignore NY's AD statutes.

[9] https://commons.erau.edu/cgi/viewcontent.cgi?article=1201&context=jdfsl

As a result of HAs lies described above, the Lower Court ignored many of O'Neill's claims in the Order, and when making decisions. Further, many of O'Neill's claims are based on the premise the DB/Wilder team acted illegally and commit crimes. (A138, A148, A150, A154, A155, A163, A164, A175, A176, A177, A178, A179, A180, A181, A191, A193, A196, A198, A199, A203, A205, A206, A210, A211, A223, A224, A48). Yet, due to *ex-parte* communication, the Lower Court dismissed many of O'Neill's claims because the DB/Wilder team and HAs lied and claimed their actions were legal when in fact their actions were criminal and violated numerous laws and ethical standards.

The Report upon which the Order is based (A35) is also flawed for several others reasons. Among other things, it is clear the rationale in the report for dismissing O'Neill's ADA (42 U.S.C.A. §§ 12101-12213), fraud, breach of fiduciary duty, IIED, RICO, and fraudulent concealment claims was designed to be "deliberately vague" to strip O'Neill of her due process rights. For example, O'Neill's hospital records were withheld from O'Neill in violation of the ADA, yet, the Report falsely claimed the records were not withheld because O'Neill is "mentally ill" and a "safety risk" even though the Report failed to specify why withholding records in violation of federal and state laws was not an ADA violation. In fact, the Report failed to specify any reason why HAs' violated their legal duties and failed to produce copies of O'Neill's protected health information

(“PHI”) or send denial of access letters as required by HIPAA [45 CFR § 164.524(a)(3)], state law (PBH § 18(2), and Joint Commission (“JC”) standards [42 U.S.C. § 1395bb(a)] (A68; A173; A150-1, A195).

Second, based on the vague manner the Report was deceptively written (A35-49), it is clear the Report relied on “secret findings of fact and conclusions of law” that have been withheld from O’Neill for years in violation of her due process rights. “Secret findings of fact and conclusions of law” do not refute O’Neill’s ADA or other claims. For example, for purposes of the ADA, the term "disability" means (1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 141 A.L.R. Fed. 603 (Originally published in 1997). (A227). Given, this Court found the inability to sit for 15 minutes may be a disability [*Parada v. Banco Indus. de Venezuela, C.A.*, 753 F.3d 62, 70 (2d Cir. 2014)], and the EMTALA and CMS require any hospital patient perceived to be a danger to self or others to be examined in person and treated by a psychiatrist, by definition, according to the ADA, O’Neill meets the requirements for disability under the ADA.

Given there is medical treatment for those who are mentally ill, show aggressive behavior and are a safety risk to self or others,[10] HAs are illegally withholding information based on a perceived disability that should have been treated by HAs' psychiatrists years ago if said disability really did exist. By failing to have psychiatrists perform psychiatric exams and releasing O'Neill when she was not medically "stabilized" according to the EMTALA, HAs violated the EMTALA, and should have incurred CMPs at a minimum as a result of their misconduct. Further, by failing to comply with their federal and state statutory duties to provide records or send denial of access letters, HAs violated the ADA, EMTALA, HIPAA, discharge regulations [42 U.S.C. § 1395bb(a); 42 C.F.R. § 482.43(a)(1)-(3); 42 C.F.R. § 485.642(a)(1)-(3)] and JC standards.

JC standards stated O'Neill had a right to written substantiation in hospital records she could see for any diagnosis or condition. (A68) (42 U.S.C. § 1395bb(a); RC.01.01, EP5: "The medical record contains the information needed to support the patient's diagnosis and condition") (A69) (42 U.S.C. § 1395bb(a); PC.01.03.01, EP6, "The written plan of care includes the following…A substantiated diagnosis (The substantiated diagnosis is the diagnosis identified by the treatment team to be the primary focus up which treatment planning will be

---

[10]&view=article&id=73#:~:text=The%20SAFE%20Act%20amends%20the,engage%20in%20conduct%20that%20would

based. It evolves from the synthesis of data from various disciplines). Thus, if O'Neill really was a safety risk, HAs were required by JC standards and federal law to provide substantiation for any claim O'Neill is a safety risk to O'Neill in writing. *Id.* Yet, all failed to do so, and instead deliberately lied to O'Neill and deceived her. Further, HAs also violated the ADA and JC standards when they failed to have a written workable discharge plan O'Neill could read to comply with federal standards. (A73, 42 U.S.C. § 1395bb(a); PC.04.01.05 "Before the hospital discharges or transfers a patient it informs and educates the patient about his or her follow-up care, treatment, and services"); (A73, 42 U.S.C. § 1395bb(a); PC.04.01.05, "The hospital has a process that addresses the patient's need for continuing care, treatment, and services after discharge"). A piece of paper executed under state law in the form of an AD did not allow HAs to ignore their federal duties. Instead, case law is clear, any AD cannot be followed by a healthcare provider if it conflicts with "generally accepted community practice standards" and/or "applicable law." (A229).

Given the Wilder team's fondness for trying to blame O'Neill for their wrongdoing, O'Neill is confident HAs are trying to claim they did not follow HIPAA, EMTALA, JC standards, federal discharge regulations, and state laws and regulations because it was O'Neill's wish to violate federal and state laws. However, HAs clearly had NO authority to ignore their federal and state duties due

to a document executed under state law in the form of an AD. It is also against not just "generally accepted community practice standards," but is also counter to every state's public policy to deprive a person who is seriously mentally ill and a safety risk to self or others of access to follow-up care and treatment, social services, benefits, and medical records that can used to apply for Medicare and other benefits. (A68-73; A229). Yet, that is precisely what HAs have done to Appellant despite the fact that depriving continuity of care and social services to someone who is "mentally ill" and a "safety risk" violates federal laws, JC standards and state's public policies. Given HAs never informed O'Neill she was deemed a safety risk, let alone in writing as required, it is clear HAs deliberately lied to O'Neill and deprived her of her rights while at the same time clearly violating numerous laws and policies.

Further, the fraud claiming to be O'Neill's "agent" has fiduciary duties, and a scheme or transaction in which a party uses his position as an agent in a self-dealing manner is presumed to be invalid. *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 530 F.Supp.2d 486, 507 (agent owed [principal] a right of honest services under federal statutes, and Appellees engaged in a scheme to deprive it of those services); *Cleary v. Cleary*, 427 Mass. at 295-96. Yet, despite the fiduciary duties of the agent under an AD [*Matter of Adler*, 83 Misc. 3d 911, 217 N.Y.S.3d 417 (N.Y. Sup. Ct. 2024)], the agent requested HAs lie to O'Neill,

fail to comply with federal regulations and send denial of access letters, lie and initially claim to O'Neill in 2017 and 2018 that O'Neill had all her hospital records, and then years later in 2022 change stories after O'Neill proved in court that the hospital records were *ipse dixit* and failed to conform with basic standards. (A179, A70).

Rather obviously, depriving O'Neill of her rights under JC standards also violated the agent's fiduciary duties. HIPAA states HAs were never allowed to give O'Neill's PHI to any "agent" if that agent was abusing or harming O'Neill. [45 CFR § 164.502(g)(5)(i)(A)(1)], which clearly the DB/Wilder team was.

Further, the Report clearly relied on court orders that were the product of numerous violations of court rules and *ex-parte* communication. Any agent under a POA was required to follow court rules. Yet, no fake agent ever complied with court rules requiring the filing of notices of appearance and baring *ex-parte* communication. The court orders produced as a result of *ex-parte* communication, should be vacated because (a) the orders were based on hearsay and *ex parte* lies; (b) Appellant was not notified of the *ex-parte* communication let alone given an opportunity to cross examine people making false claims about her behind her back; (c) there was no ascertainable record of what information was presented on an *ex-parte* basis; and (d) records produced after the court orders in question prove beyond any doubt O'Neill was stripped of her most basic due process rights.

There is no way O'Neill or any person could have written a competent complaint given the repeated lies told to O'Neill by HAs' personnel about the use of NY law in O'Neill's case (A275-277). To claim amending the SAC was "futile" as stated in the Report is clearly erroneous because it is clearly not true that a litigant could state facts she was not aware existed, particularly in a case such as this when HAs lied to Appellant for years, and are now claiming on an *ex-parte* basis to be allowed to violate various state and federal laws, informed consent statutes, and agency laws.

## STATEMENT OF ISSUES RAISED ON APPEAL

Whether the District Court:

1. Improperly entertained *ex-parte* communication from liars who claimed to be O'Neill's "agent," when the documentation required to prove O'Neill had an agent is not on record with this court or any court or with HAs as required by NY statute [PBH § 2984(1)]. Further, the fake agent violated various court rules requiring notices of appearance and records of information shared during *ex-parte* communication O'Neill could see.
2. Failed to read PBH § 2990, the statute the DB/Wilder team and HAs claims gives them the right to implement an AD according to the laws of another state given nothing in PBH 2990 ever allowed Defendants to IMPLEMENT any AD executed in any state according to the laws of another state.
3. Ignored the HHS statement that when crafting HIPAA laws and regulations, the US Congress and HHS never intended for HIPAA to supersede any patient care laws, including Joint Commission standards, the EMTALA or state patient care laws.
4. Improperly claimed that by passing the AD statute in NY the NY legislature intended to supersede all other NY state and federal patient laws and allow patients to dictate the practice of medicine in the state of NY and give patients the right to give permission to doctors to commit crimes.
5. Decided NY hospitals are not required to follow the laws of the state of NY and can instead choose the laws they want to follow and their own regulator.

6. Failed to determine Defendants violated numerous state and federal statutes and ethical obligations.
7. Failed to understand the incredibly basic fact that no mental health professional can provide “therapy” when the only basis for “therapy” is a word or phrase like “paranoid,” “delusional,” or “circular thinking” or a diagnosis code in a medical record, and the facts on record were rewritten and shown to the product of an incompetent nurse.
8. Failed to acknowledge that only a sick freak would try to convince a person who truly was “delusional,” or “paranoid,” or showed “circular thinking” that the claims she was “delusional,” paranoid” or showed “circular thinking” were based on what she said and did on a hospitals’ premises when that was clearly not the case.
9. Listened to a group of sadistic freaks who are intent on labelling someone as “damaged,” “disabled,” “violent,” and “mentally-ill” while stripping that same individual of ALL legally protected due process rights, the ability to hire outside experts, and the ability access court records she can access that show the contents of *ex-parte* communication.
10. Tried to gaslight O’Neill into believing that claims she was mentally ill were based on what she said and did on HAs premises at the time of treatment.
11. Ignored ethical and legal standards that state any seriously mentally ill or violent person or someone with substance abuse issues must given access to treatment.
12. Ignored ethics standards and laws that require patients be given adequate recovery-oriented treatment rather than labelled “damaged,” and “disabled” with no factual support.
13. Relied on a corrupt forensic person that improperly destroyed evidence on O’Neill’s i-Phone, perjured himself, violated ethical norms, and illegally sought to blame O’Neill for his wrong-doing by using the fake agent on an *ex-parte* basis.
14. Improperly granted Defendants’ motion to dismiss under Rule 12(b)(6)
    a. O’Neill’s claims for fraud, fraudulent concealment, and intentional infliction of emotional distress (“IIED”) were improperly dismissed by the Lower Court because the dismissal of O’Neill’s claims was based on a series of lies told by Defendants and the DB/Wilder team on an *ex-parte* basis.
    b. Among other things the Lower Court ruled HAs had not fraudulently concealed information because the Lower Court was led to believe HAs were following state and federal laws when clearly that was not the case.
    c. Further, O’Neill’s IIED claims were improperly dismissed because the court was told HAs and the DB/Wilder team’s actions were legal when in fact their actions were criminal, illegal, and outrageous.

d. Further, O'Neill's fraud claims were based on information she clearly could never have known or guessed.
e. O'Neill's defamation and ADA claims were raised for the first time in the SAC. Given O'Neill is *pro se*, the judge violated Rule 15 because clearly it is not futile for O'Neill to amend the SAC, given lawyers with years of experience are given numerous opportunities to amend complaints, particularly when new information becomes available.

15. Deprived Appellant of her right to amend her complaint by falsely claiming amending claims raised for the first time in the SAC was "futile."
16. Improperly denied O'Neill's motions to amend her complaint.

## LEGAL ARGUMENT

## POINT I: NY LAW GOVERNED AD.

As explained by the Center for Medicare & Medicaid Services ("CMS"), state courts have addressed the concept of substituted judgment, whereby the patient's agent under an AD is allowed to (1) make medical decisions in place of the principal, but not allowed to make any decision a principal could not make, (2) make decisions based on the patient's values and interests, rather than the representative's own values and interests, and (3) act in the patient's best interest. (A228). Yet, here, HAs and the DB/Wilder team are claiming the fake "agent" has a right to do things no patient could do and make self-dealing decisions that show a clear conflict of interest between the agent and principal and clearly show the agent and HAs intended to harm and abuse O'Neill.

The AD statute in NY and every other US state does not create any additional rights for an agent a principal does not have. Despite that very obvious fact, the DB/Wilder team and HAs have abused AD statutes, and decided that an AD gives them rights a patient does not possess even though CMS makes it

abundantly clear that an agent under an AD is only allowed to make decisions a patient is allowed to make and those decisions must be in the patient's best interests, not the agent's. Here, there is no question the fake agent acted in a self-dealing manner, had conflicts of interests, and harmed and abused O'Neill.

Further, HAs and the DB/Wilder team are claiming ADs are contracts. ADs are not contracts. [*Hogan v. Bullock*, 224 N.Y.S.3d 226, 229 (3d Dep't 2024); O.C.G.A. § 13-3-1], and doctors are not allowed to honor provisions of ADs that conflict with federal and state laws, regulations, and standards in the states in which they are licensed to practice medicine. [*Shannon MACDONALD, et al., v. Otto F. SABANDO.*, 2024 WL 2748417 (D.N.J.)]. Here, attempting to "accept" fake claims in a wish list the DB/Wilder team falsely claims O'Neill signed makes no sense for numerous reasons. Most importantly, even if the AD were legitimate, physicians are not allowed to honor an item on a wish list that conflicts with laws or generally accepted practice standards. (PBH § 2983(3); PBH § 2983(4); PBH § 2983(4); PBH § 2983(5); PBH § 2983(6); PBH § 2984(1); PBH § 2989(3); A234, A253-254). Thus, even if O'Neill claimed she did not want treatment or to approve a discharge plan in an AD, NY's AD statute required HAs to give O'Neill her treatment options given the importance of informed consent (PBH § 2983(3); PBH § 2983(4); PBH § 2983(4); PBH § 2983(5); PBH § 2983(6); PBH § 2984(1); PBH § 2989(3), A234, A253-254), and if O'Neill did not want treatment, then HAs were

required to write the fact O'Neill declined treatment in their medical records. Yet, none did, because they are lying about what ADs allow them to do.

As described in an article by the former director of the ABA's Commission on Law and Aging, it is well understood though basic google searches that, "Even if [an AD is] legally recognized [in another state], the directive may not be interpreted in the way the maker of the document intended, because the definition of terms and rules for implementing the document vary across states." (A234; A253-254). Thus, the law of the state in which an AD is used for treatment governs the use of the AD, not the laws of the state in which the document was executed. *Id.* Further, several states including Michigan and South Dakota refuse to accept an AD executed in another state for any reason, while Vermont's reciprocity statute states, "To the extent possible under conflicts of law doctrine, an AD executed in Vermont shall be interpreted according to Vermont law." § 9716. Thus, as noted by Vermont's legislature, the state in which a document is executed does not control the use of the document in another state, particularly, when matters such as informed consent are involved. 42 CFR § 482.13(b)(2). Courts have also determined that the AD laws of one state have no binding effect on the practice of medicine in another state. *Dickerson v. Longoria*, 414 Md. 419, 438, 995 A.2d 721, 733 (2010).

## POINT II: FAKE "AGENT" ILLEGALY TURNED O'NEILL'S MEDICAL RECORDS INTO INADMISSIBLE HEARSAY.

Since the 1800s, it has been a well-established matter of law that the declarations of a patient to her physician respecting her condition and symptoms at the time of seeking medical aid are admissible as evidence, under a well-settled exception to the rule excluding "hearsay" because those statements were made at the time of treatment. *Delaware, L. & W.R. Co. v. Roalefs*, 70 F. 21, 22 (3d Cir. 1895). Here, HAs ignored legal precedent that has governed NY and GA law since the 1800s. *Id.*

There are thousands of legal cases that are easy to find that show who said what is important from a legal and medical perspective. 42 CFR §482.24(b). In fact, providers are required to write in medical records who provided information contained in medical records, and providers have an affirmative duty to maintain accurate medical records of what occurred at the time of treatment during their evaluations. 42 CFR §482.24(b). Yet, in O'Neill's case, none of this happened. In fact, not a single evaluation contained in her medical records from any HA is accurate and shown in Appellant's recordings. Thus, the entire reason medical records are admissible under different rules does not apply in O'Neill's case. Rather sickly, and in violation of federal obligations and state laws, the DB/Wilder team falsely claimed in O'Neill's records, while impersonating Appellant, that she said things she never said and did things she never did. [42 CFR §482.24(b)].

No federal or state law allows HAs to falsify their records to lie about what O'Neill said and did on HAs' premises and make it appear as if O'Neill said and did things during evaluations on HAs' premises when in fact the information came from a third party. Basic standards required HAs to show time and date of entry. (A170). Yet, it is clear the time and date of each providers' entry in O'Neill's records cannot be correct if said entries were the result of conversations with Appellant and a fake agent at different times and dates, which HAs have admitted is the case. Therefore, HAs have admitted to violating federal and state laws and fraudulently altering O'Neill's medical records. As a result, HAs have rendered Appellant's medical records heaps of garbage because they are filed with unattributed lies from third parties that constitute medically and legally inadmissible hearsay. An agent does not have a right to improperly impersonate O'Neill in her records and fail to note that claims are being made by the agent and were directly opposite of what O'Neill said at the time of evaluation and treatment as required by law. (A204, A154, A155, A159, A172, A175, A204, A59, A88).

**POINT III: APPELLEES VIOLATED NUMEROUS LAWS**

As described in the Affidavit (A280-283), it is also clear the DB/Wilder team is also claiming it has a right to violate O'Neill's federally protected rights by claiming one HIPAA regulation [45 CFR § 164.524(a)(3)] gives HAs and the DB/Wilder team the right to violate numerous other HIPAA regulations and other federal and state statutes as described herein. Here again, HAs and the DB/Wilder

team are simply wrong. First, HAs are not permitted to selectively enforce one HIPAA provisions while ignoring several other HIPAA regulations.

Rather, HIPAA states hospitals should not treat someone as an "agent" in cases of abuse. [45 CFR § 164.502(g)(5)(i) (A)(1)]. Here, based on the proven and undisputed facts HAs and the fake agent abused O'Neill, HAs are clearly lying.

HIPAA was never intended to preempt or interfere with federal patient care laws, and HIPAA is to be narrowly construed to apply only to issues specifically addressed within HIPAA (e.g., privacy and security). [65 FR 82462; 65 FR 82581]. HIPAA does not preempt state or federal laws unless the laws are in direct contradiction with HIPAA. *Id.* Thus, if a law deals with the use and disclosure of PHI, and the law conflicts with HIPAA, then there is a preemption analysis. *Id.* However, if a law, as broadly defined as the "state's constitution;" or "state statutes, regulations or rules;" or "legal principles established under common law" or "other state action having the force and effect of law," is not contrary to HIPAA, then HIPPA does not preempt the state law. *Id.*

**POINT IV: APPELLEES VIOLATED THE ADA.**

The Report falsely claimed O'Neill's statements HAs violated HIPAA amounted to a HIPAA cause of action. However, case law shows this is NOT true. Instead, HIPAA and JC standards are commonly used to provide evidence of standards in tort actions. *Kelley v. Apria Healthcare, LLC*, 232 F. Supp. 3d 983

(E.D. Tenn. 2017) ("standards laid down by [CMS] and [JC] could be used to prove" tortious conduct); *Acosta v. Byrum*, 638 S.E.2d 246, 253 (N.C. Ct. App. 2006) ("[P]laintiff cites to HIPAA as evidence of the appropriate standard of care. Since Appellant made no HIPAA claim, HIPAA is inapplicable beyond providing evidence of the duty of care owed by [the doctor]"). Here, O'Neill made no HIPAA claim, but O'Neill was allowed to show how HAs HIPAA violations constituted misconduct.

There is no question federal and state laws mandate hospitals have medical records departments that provide records to patients. [PHL § 18; 42 CFR § 482.24]. There is also no question O'Neill had a basic legal right to records that provided factual support to substantiate any claim of mental illness and that she was a safety risk (A166). O'Neill also had a legal right to a written discharge plan that accounted for continuity of care, allowed her access social services and benefits, and allowed her to apply for Medicare if she really was "mentally ill." (A168). But, HAs failed to comply with even the most basic federal standards, designed to provide a floor to patient safety and quality.

Medical records departments are a check on frauds like the fake agent who is clearly using information asymmetry to harm O'Neill. Depriving someone LHH labelled "vulnerable" access to a medical records department, PHI and a written

discharge plan that complied with federal standards is clearly not in O'Neill's interests and instead shows abuse. (A166-168).

**POINT V: DEFAMATION CLAIMS SHOULD NOT BE DISMISSED.**

To recommend dismissing O'Neill's defamation claims, the Report used the case. *Neal v. Asta Funding, Inc.*, No. 13–cv–2176, 2014 WL 3887760, 2014 U.S. Dist. LEXIS 113142, (S.D.N.Y. June 17, 2014). But, *Neal* is differentiated on the facts. In *Neal*, the Appellant did not know the person who was making phone calls about him to defame him, and clearly, there was no "agent" with fiduciary duties to report to a principal. Here, NY's public policy required any fake "agent" to report his activities that dealt with legal issues regarding O'Neill to O'Neill. Thus, had the fake agent reported his lawyer's phone calls to various courts and judges, including the phone call to the Eleventh Circuit on or about October 16, 2023 to have O'Neill's appeal dismissed, then there would have been no debate about whether O'Neill could add times to an amended complaint. Here, because the fake "agent" had a duty to report to O'Neill, the Report was clearly erroneous when it claimed O'Neill's complaint could not be amended to include times because the fake "agent" was required to report to O'Neill.

A case in CT also used *Neal*. [ESPN]. Notably, the CT court ruled *Neal* was dismissed for several factors, not just a missing time. *Id.* The CT case also stated Rule 8(a) applies to Appellant's defamation claims because in federal cases based on diversity jurisdiction, the general pleading standard in FRCP 8(a) applies to

defamation claims. *Germain v. M & T Bank Corp.*, 111 F. Supp. 3d 506, 537 (S.D.N.Y. 2015) (while NY requires pleading the words of the purported defamation with particularity…, federal law only requires standard notice pleading … under FRCP 8). Thus, Appellant was only required to follow FRCP 8 standards which did not require Appellant to identify "the unknown individual agent or employee of a corporate Defendant who made the allegedly defamatory statement at issue." *Id.* Thus, the Report held O'Neill to an inappropriate standard, and O'Neill added information about time to the Affidavit (A290-291).

## POINT VI: APPELLANT HAD CLAIMS FOR BREACHS OF FIDUCIARY DUTY.

The Report recommended the dismissal of the breach of fiduciary duty cause of action under faulty premises because the case the Report relied upon deals with Ciox, a data provider. HAs and other healthcare providers are licensed by the state of NY and have statutory duties Ciox does not have as described in Exhibit E (A263-265). Thus, given Ciox is not subjected to NY licensure requirements and NY and federal healthcare laws, comparing HAs to Ciox is like comparing apples to oranges. The Ciox case is also differentiated on the facts. *Shelton v. CIOX Health, LLC*, No. 17 CV 808, 2018 WL 4211447, at *5 (E.D.N.Y. July 20, 2018).

First in *Ciox*, the Appellant was given copies of her medical records as shown on page 8 of the *Ciox* order. *Id.* Next, the fiduciary duty analysis in *Ciox* dealt with the cost of medical records, not the provision of records. The *Ciox* order

also stated the reason the court rejected the claim *Ciox* had a fiduciary duty related to the "copying of records" (*Id.* Page 9) was because: To the Court's knowledge, none of the cases addressing violations of § 18 have found or even discussed a health care provider's, let alone a third party contractor's, fiduciary duty to provide such records. *Id.* Thus, the *Ciox* order made clear that court rejected the argument Ciox had a fiduciary duty related to the "copying of records" because Ciox was a data provider, not a hospital, and there was no case law "finding a fiduciary duty related to the copying of records" and there are no NY cases related to the provision of records. *Id.* Yet, case law in other jurisdictions states healthcare providers have a fiduciary duty to follow public policy and provide patients with copies of their own records because "[p]ublic policy requires disclosure of medical information to the person involved." *Cook v. Optimum/Ideal Managers Inc.*, 130 Ill. App. 3d 180, 188, 473 N.E.2d 334, 340 (1984); *Cannell v. Medical and Surgical Clinic, S.C.* (1974), 21 Ill.App.3d 383, 315 N.E.2d 278. Given violent prisoners in correctional facilities are given substantiation for any claim of mental illness, and are allowed to participate in their own treatment and discharge planning processes, and failure to provide treatment to anyone who is seriously mentally ill is a violation of state and federal laws [A132, 42 USC § 1395bb(a), RC.01.01.01 EP8, PBH § 2983(5)], HAs are lying about their statutory duties.

Given the differentiation on the facts, the *Ciox* case does not make sense in analyzing O'Neill's claims because all the Ciox case said is that there are no NY cases regarding the provision of medical records, not that NY hospitals do not have fiduciary duties to provide medical records to patients. Further, under NY law, doctors have a fiduciary duty to provide material facts and records to patients, and failure to do so results in liabilities to hospitals who conceal relevant facts from patients. *Ross v. Cmty. Gen. Hosp. of Sullivan Cnty.*, 150 A.D.2d 838, 841, 541 N.Y.S.2d 246, 249 (1989). ("Because of the fiduciary relationship between physician and patient…intentional concealment of material facts" constitutes tortious conduct.). Here, the substantiation for any claims of mental illness and claims O'Neill was a safety risk to self or others was required to be in her medical records according to JC standards 42 U.S.C. § 1395bb(a), and HA's physicians had a fiduciary duty to disclose information to O'Neill as a matter of public policy and because "the physician is under an obligation to communicate specific information to the patient when the exigencies of reasonable care call for it." *Garone v. Roberts' Tech. & Trade Sch., Inc.*, 47 A.D.2d 306, 310, 366 N.Y.S.2d 129, 133 (1975). Here, the duty was not just reasonable, the duty was a federal obligation. The fake wish list in the fake AD does not absolve the DB/Wilder team of these duties, instead, HAs were required to follow NY's AD statute [A234; 253-254, A259], HIPAA and NY state laws, and generally accepted practice standards. It is

clear the Lower Court dismissed this claim due to lies told on an *ex-parte* basis and the ridiculous claim NY hospitals were allowed to follow GA laws.

Likewise, the denial of access letters required under HIPAA contained material information O'Neill needed. Further, federal discharge planning requirements clearly show Appellant had a legal right to see a comprehensive written discharge plan accounting for continuity of care, access to social services, and benefits. (A68-80). Thus, *Ciox* is obviously differentiated on the facts and cannot be applied here because in *Ciox* the physician was not withholding material information the patient needed, and *Ciox* did not have statutory duties to provide necessary PHI, information for discharge, and other data to patients.

Hospitals are bound by the doctrine of *respondeat superior* and thereby responsible for the actions of their employees. The fiduciary nature of the physician-patient relationship places a duty on a physician to disclose to the patient that which, in the patient's best interests, the patient should know, and that duty extends also to hospitals. *Sherwood v. Danbury Hosp.*, 252 Conn. 193, 746 A.2d 730 (2000). Under the doctrine of *respondeat superior*, hospitals are responsible for ensuring their employees perform their fiduciary duties, and in this case, statutes dictate that the duty to provide information JC standards O'Neill had a right to see. *D'Elia v. Menorah Home and Hosp. for Aged and Infirm*, 51 A.D.3d 848, 859 N.Y.S.2d 224 (2d Dept. 2008).

The Report also ignored O'Neill's claim for breach of fiduciary duty due to the fact HAs violated O'Neill's privacy. *Perry v. Rockmore*, 228 N.Y.S.3d 753 (App. Div. 2025). LHH violated O'Neill's informed consent rights, and right to privacy. No agent had any means of speaking to LHH's physician without LHH gaining informed consent. Yet, LHH never bothered to gain O'Neill's informed consent, and instead violated O'Neill's privacy by speaking to a fake "agent" with a clear conflict of interest who was clearly seeking to harm her in violation of HIPAA and federal duties.

**POINT VII: FRAUDULENT CONCEALMENT CLAIMS ARE VALID.**

For the first time in the Report, the court raised the issue, "Appellant has not described with particularity what material information was allegedly concealed, by whom, or for what purpose." However, this issue does not make sense given courts have ruled deficiencies in pleadings were not fatal in cases involving fraudulent concealment. *Slainte Invs. Ltd. P'ship v. Jeffrey*, 142 F. Supp. 3d 239, 262 (D. Conn. 2015) ("That Appellant does not identify with precision the dates on which the other actions allegedly constituting fraudulent concealment took place is not fatal"). In fact, the cornerstone of Rule 9(b)'s specificity requirement is that a Appellee be provided "with fair notice of a Appellant's claim and adequate information to frame a response." *U.S. ex rel. Tiesinga v. Dianon Sys., Inc.*, 231 F.R.D. 122, 123 (D.Conn.2005). Therefore, "dates, times and places need not be pleaded with absolute precision, so long as the allegations sufficiently put the

Appellee on notice as to the circumstances." *In re U.S. Foodservice Inc. Pricing Litig.*, 2009 WL 5064468, at *18 (D.Conn. Dec. 15, 2009). Here, O'Neill has clearly given fair notice to HAs of her claims.

Moreover, courts have relaxed Rule 9(b)'s heightened pleading requirements in cases involving complex fraudulent schemes or those occurring over a lengthy period of time. *U.S. ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497 (S.D.N.Y. 2014). Here, O'Neill has been the victim of a complex scheme, which involved concealment of information and purposeful omissions over a long period of time. As stated in the Affidavit (A270-271), O'Neill stated her fraudulent concealment claims to the best of her knowledge, and O'Neill added a table to the Affidavit (Table IV) containing as much information as possible. Appellees lied in their response and claimed by providing a table O'Neill admitted that she had additional information. However, the reason O'Neill did not add the information in the table to the SAC is because the information was on "information and belief," and it has subsequently come to light that the information in the table is incorrect. For example, O'Neill had no clue who at HAs was responsible for the fraud because she did not know. She guessed in the table that the person responsible was in management. However, it has subsequently come to light that the true person responsible is someone in the legal department. O'Neill would never have reasonably guessed someone in legal given the violations and crimes in question

are covered in the first few chapters of the healthcare Hornbook. Thus, the reason the information was not in the SAC is because O'Neill had no means of knowing the missing information, and by adding the table, she ended up harming herself because the information is inaccurate.

## POINT VIII: FRAUD CLAIMS ARE VALID.

The Report's claim O'Neill could have added any more information than she did to her fraud causes of action is a lie. O'Neill has no idea what happened behind her back, and the fake agent is clearly incentivizing others, including HAs as explained in the SAC (see above section on facts of case for violations) and (A275), to lie to coverup for the DB/Wilder team's crimes. As in prior filings (A275), HAs deliberately lied to O'Neill in violation of numerous laws.

Clearly, the Report relied on *ex-parte* information and false claims O'Neill was given additional information by the fake "agent." However, that claim is clearly a lie. If the fake "agent" had provided missing data to O'Neill in the fake messaging accounts, then there would have been no need for HAs to lie in the GA Action and claim O'Neill would have to make it to the discovery phase of litigation to have access to HAs' fraudulently concealed second sets of hospital records.

The recommendation in the Report to dismiss the fraud causes of action relies on the faulty premises O'Neill could have had access to information she clearly does not have. In cases such as this, this court has ruled that even when

plaintiffs are not able to plead certain facts that are within solely the Appellee's knowledge, plaintiffs have met their pleading requirements. United States ex rel. *Chorches for Bankr. Est. of Fabula v. Am. Med. Response*, Inc., 865 F.3d 71, 81 (2d Cir. 2017). (complaint satisfied Rule 9(b) even though it did not provide details, such as invoice numbers, invoice dates, and amounts billed or reimbursed).

Further, in the case *United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, the court and Appellee specified what information was missing from Appellant's fraud cause of action (e.g., invoice numbers, invoice dates). *Id.* Here, neither HAs or the court were able to specify which information was missing from O'Neill's fiduciary duty, fraud and RICO causes of action even though listing missing information is standard, and the fraud claiming to be Appellant's "agent" clearly should have provided the missing information to O'Neill if the fraud really was O'Neill's agent, and acting in her interests as required by law. Here, the fake "agent" is engaging in *ex-parte* communication to harm O'Neill, but clearly never gave O'Neill the information. Given the fake agent and HAs treating O'Neill worse than a violent criminal and numerous state and federal laws by illegally withholding information from O'Neill in her medical records why would any sane individual believe the fake messaging accounts were actually O'Neill's and the fake agent was providing information to O'Neill in the phony messaging accounts.

This court has also held plaintiffs are not required to state in a complaint "information" that is "peculiarly within [Appellee's] knowledge." *Id.* Rather, in cases in which "information about Appellee's fraud are "not accessible" to plaintiffs, and plaintiffs are not able to participate in defendant's procedures, and defendant made it impossible for plaintiff to have "access to all of the information necessary to certify on personal knowledge" this Court has held that plaintiffs are not required to pled facts they cannot possible know." *Id.* Here, Appellant did the best she could based on the information available to her. Relying on ex-parte communication, fake messaging accounts, and phony accounts is absurd.

## POINT IX: APPELLANT PROPERLY STATED IIED CLAIMS.

The Report's claim O'Neill's IIED did not rise to the level is based on "secret findings of fact" Appellant had no knowledge of and which deprived O'Neill of her due process rights. Notice cannot be given in fake messaging accounts and be based on the word of a fraudulent forensic person that lied to a court, violated ethics standards, and broke numerous criminal laws, and POA laws as described herein. It is also clear HAs' actions have significantly harmed O'Neill and met the bar required by law. The Report should have viewed the allegations in the SAC as a series of acts that, taken together, constitute extreme and outrageous conduct. Taken together, the acts stated in the SAC amount to a malicious

campaign of harassment which is sufficient as a matter of law to meet IIED standards. *Rich v. Fox News Network, LLC*, 939 F.3d 112, 117 (2d Cir. 2019).

Under NY law, although "[t]he standard of outrageous conduct is strict, rigorous and difficult to satisfy ..., that is not the case when there is a deliberate and malicious campaign of harassment or intimidation" as is the case here. *Scollar v. City of New York*, 160 A.D.3d 140, 74 N.Y.S.3d 173, 178 (1st Dep't 2018). "[W]here severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation," IIED provides a remedy. *Id.* In other words, under NY law, the proper inquiry is not merely whether each individual act might be outrageous. Rather, the question is whether those actions, under the totality of the circumstances, amounted to a deliberate and malicious campaign. *Rich v. Fox News Network, LLC*, 939 F.3d 112, 117 (2d Cir. 2019).

Here, O'Neill has alleged a campaign of emotional torture. As stated in the SAC, from 2017 onwards, the Wilder and DB teams have attempted to undermine and discredit O'Neill by falsely claiming O'Neill has a series of mental health disorders she does not have. When O'Neill went to HAs, the DB/Wilder team contacted each HA and made false and malicious claims about O'Neill without O'Neill's knowledge or consent. Despite statutory requirements, HAs have not been able to produce any authorization to disclose O'Neill's PHI to any third party. In addition, HAs each deceived O'Neill by setting up a fraudulent system in which

the HAs prepared two separate sets of medical records; one set O'Neill has been able to see and another set of records O'Neill has not been able to see. Setting up a system of hidden records violated federal [45 CFR § 164.524(d)(3)] and NY law [PBH § 18(2)]. Further, by law, each HA was required to send denial of access letters. 45 CFR 164.524(a)(2)-(4). Yet, HAs have all refused to do so. O'Neill never appointed anyone to serve as an agent for her. Setting up a fraudulent two medical record system, and claiming O'Neill is mentally ill based on a set of false statements and lies provided by the DB/Wilder team O'Neill has not able to see and which is contained in a second set of medical records Appellant has not been allowed to access is clearly abusive and fraudulent. To cover-up for their fraudulent activities, HAs mindlessly mimicked false stories about O'Neill's mental health created by the DB/Wilder team, even though the false claims about O'Neill's mental health are based on fake messaging accounts Wilder set up in O'Neill's name without O'Neill's knowledge or consent, and various other ridiculous lies.

Further, at the DB/Wilder teams' behest, HAs and other hospitals created medical records based on "mental impressions," rather than comply with their affirmative duties under law [42 U.S.C. § 1395cc(f); PBH § 2984(1)] and JC standards to write complete and accurate medical records. From 2017 onwards,

O'Neill's medical records are *ipse dixit*, inadmissible in court, and fail to provide factual support for fake claims O'Neill suffers from any mental illness.

## POINT X: APPELLANT PROPERLY STATED RICO CLAIM.

The Report's claim the predicate acts were not valid under the RICO statute and claims HAs were not engaged in an "enterprise" are based on the "secret findings of fact and conclusions of law" and lies told by HAs and the DB/Wilder team on an *ex-parte* basis. The Report's rejection of the numerous predicate acts and fact HAs' actions constituted an enterprise as described in the SAC are based on the fraudulent view HAs records were legally admissible, a view untethered to reality in light of the fact HAs records are clearly heaps of garbage containing unattributed hearsay which clearly violated numerous state and federal statutes and regulations as described above. Appellant refers the court to the Affidavit (A263).

## POINT XI: APPELLANT MOTIONS TO AMEND WERE IMPROPERLY DENIED.

O'Neill and requested leave to file the Second Amended Complaint ("SAC"), pursuant to Rule 18(a), Rule 15(a), and Rule 15(d) of the Federal Rules of Civil Procedure on the grounds that, since plaintiff filed her First Amended Complaint ("FAC"), new facts have been discovered and events have occurred that are material to this action, as is more fully shown in the SAC. (A289). Yet, her request was denied. (A12).

Rule 15(d) provides for supplemental pleading of transactions, occurrences, or events that happened since the date of the pleadings sought to be supplemented. The provision of the FRCP regarding the filing of supplemental pleadings is a tool of judicial economy. *Keith v. Volpe*, 858 F.2d 467, 26 Fed. R. Evid. Serv. 1249, 12 Fed. R. Serv. 3d 323 (9th Cir. 1988). Given the goal of judicial economy in light of new events and occurrences, several courts have ruled that a supplemental pleading may include a new "cause of action" when it would be convenient to litigate all the claims between the parties in the same action. *Keith v. Volpe*, 858 F.2d 467, 474 (9th Cir. 1988).

The goal of the rule allowing supplemental pleadings is to establish a liberal policy favoring a merit-based resolution of the entire controversy between the parties. FRCP 15(d). *Eison v. Kallstrom*, 75 F. Supp. 2d 113 (S.D.N.Y. 1999). Here, it is clear that it was in the best interests of all parties to allow a supplemental pleading given the new causes of action, rather than force O'Neill to institute another action and move for consolidation under Rule 42(a), a wasteful and inefficient result. *General Bronze Corp. v. Cupples Products Corp.*, 9 F.R.D. 269 (E.D. Mo. 1949).

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be reversed.

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

This brief complies with the type-volume limitation of because this brief contains 13,987 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements because this brief has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

Dated: Baltimore, MD
March 12, 2026

Respectfully submitted,

BY:_/s/ Maura O'Neill____________
Maura O'Neill, Appellant